# NEW YORK, LAKE ERIE & WESTERN RAILROAD COMPANY *v.* WINTER'S ADMINISTRATOR.

## ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MASSACHUSETTS.

No. 169. Argued January 19, 20, 1892. — Decided February 1, 1892.

Parol evidence of what is said between a passenger on a railroad and the ticket-seller of the company, at the time of the purchase by the passenger of his ticket, is admissible as going to make up the contract of carriage and forming part of it.

Passengers on railroad trains are not presumed or required to know the rules and regulations of the company, made for the guidance of its conductors and employés, as to its own internal affairs.

Plaintiff bought a ticket in Boston entitling him to a passage over defendant's road. At the time he informed the ticket agent of his wish to stop off at the Olean station, and was then told by the agent that he would have to speak to the conductor about that. Between Binghamton and Olean the plaintiff informed the conductor that he wished to stop over at Olean and the conductor, instead of giving him a stop-over ticket, punched his ticket and told him that was sufficient to give him the right to stop over at Olean, and afterwards to use the punched ticket between Olean and Salamanca. He made the stop, and taking another train to Salamanca, presented the punched ticket, informing the conductor of what had taken

place. The conductor refused to take it and demanded full fare. The payment of this being refused, the conductor stopped the train at the next station and ejected him from it, using such force as was necessary. *Held,*

(1) That he was rightfully on the train at the time of his expulsion;

(2) That the conductor had no right to put him off for not paying his fare;

(3) That the company was liable for the act of the conductor;

(4) That the passenger had a right to refuse to be ejected from the train, and to make a sufficient resistance to being put off to denote that he was being removed against his will by compulsion;

(5) That the fact that under such circumstances he was put off the train was, of itself, a good cause of action against the company, irrespective of any physical injury he might have then received, or which was caused thereby.

When the trial court has, in its general charge, given the substance of instructions requested, there is no error in refusing to give them in the language requested.

It is not the province of this court to determine whether a verdict was excessive.

THE court stated the case as follows:

This was an action by David T. Winter, a citizen of Massachusetts, against the New York, Lake Erie and Western Railroad Company, a New York corporation, to recover damages for having been put off the defendant's train while a passenger thereon between Binghamton and Salamanca, New York. It was commenced in a state court of Massachusetts, and was afterwards, upon the application of the defendant, removed into the proper Federal court, on the grounds of diverse citizenship and of local prejudice and influence. Several other railroad companies that were supposed to have property or funds in their hands belonging to the principal defendant were made parties defendant, as trustees or garnishees.

The declaration contained two counts. In the first it was alleged that on February 13, 1882, the plaintiff, being the owner of an unlimited first-class ticket entitling him to carriage on the defendant's road from Binghamton to Salamanca, took passage on the defendant's train at the former place to be carried to the latter; that between Binghamton and Olean (a station on the road between Binghamton and Salamanca)

the defendant's agent in charge of the train punched his ticket, at his request, so that he was entitled to "stop over" at Olean, and returned it to him; that he did stop over at Olean, and the next day took a train on defendant's road to go to Salamanca, on the aforesaid ticket; that the defendant's agent in charge of the last named train refused to accept his ticket, but demanded payment of a cash fare from Olean to Salamanca, and, upon his refusal to pay the same, forcibly ejected him from the car in which he was riding and removed him from the train, whereby his finger was broken and other severe and painful injuries were sustained; that his luggage and apparel were taken away on the train, and he was thereby deprived of certain valuable papers, and the place where he was ejected from the train was a great distance from any public house; and that it was at a very late hour of the night, and the weather was very cold and inclement; all of which occasioned him great bodily and mental suffering.

The second count alleged that the defendant, by its agents and servants, made an assault upon the plaintiff and ejected him from the cars in which he was lawfully travelling, and did him serious personal injury and subjected him to great personal indignity.

The defendant answered with a general denial, and further alleged that when its conductor applied to the plaintiff for his ticket, after leaving Olean, the plaintiff presented a ticket which had been cancelled to Salamanca, whereupon the conductor told him that such ticket was not good to Salamanca, and that the rule of the road would not allow him to, and he could not, accept it, although it would be good beyond Salamanca, and that he must pay full fare to that point, which the plaintiff refused to do, saying to the conductor to put him off, if he dared to do so; that the conductor told him he should be obliged to stop the train at the next station and put him off; and that, the plaintiff still refusing to pay his fare when the next station was reached, the conductor stopped the train and put him off, using no more force than was necessary and proper.

It was further alleged that the plaintiff had no lawful right

to be transported over the road to Salamanca, and was travelling on defendant's cars in violation of a uniform rule of the road which was explained to him before he was put off, and without any lawful right whatever, and that if he sustained any injuries, of any kind, it was due solely to his own wrong.

The garnishees answered separately, and, with the exception of the Fitchburg road, each averred that it had no property or funds whatever in its hands belonging to the principal defendant. The latter company, in its answer, admitted having several thousand dollars in money belonging to the principal defendant.

Upon the issues thus made up the case went to trial in the state court resulting in a verdict in favor of the plaintiff for over $6000, which, upon motion of the defendant, was set aside by the court. Soon afterwards, the cause was removed into the Federal court, as before stated. Upon a trial in that court, the jury returned a verdict in favor of the plaintiff and against the defendant for $10,000, and judgment having been entered upon the verdict for that amount, this writ of error was sued out. Since the cause was docketed in this court, the plaintiff has died, and his administrator is now representing his estate.

As shown by the bill of exceptions, the plaintiff, on the trial, to sustain the issues on his part, gave evidence to the following effect: On the morning of February 13, 1882, the plaintiff, a resident of Peabody, Massachusetts, purchased an unlimited coupon ticket at the ticket office of the Fitchburg Railroad Company in Boston, from that city to Chicago, one of its coupons being for travel over the defendant's road from Binghamton to Salamanca, New York, at the same time telling the ticket agent that he wanted to buy a ticket which would enable him to stop off at Olean, New York, a town between Binghamton and Salamanca. The agent informed him that such ticket would cost him about $3 more than an unlimited ticket good for one continuous passage over the same route, but it would allow him to stop over at Olean, as he had expressed his desire to do, by " speaking to the conductor."

Plaintiff took the ticket and started on his journey. When

he reached Binghamton three of the lower coupons had been given up, the next one being that for travel between Binghamton and Salamanca. After leaving Hornellsville, a station on the defendant's road between the last-named two places, the plaintiff said to the conductor as he came through the car to take up tickets, that he desired to stop off at Olean, at the same time asking him if they would make connection at that point with a train running south on another road to a town called Portville, where he wished to go for a short time on business. The conductor replied to him that that train would wait for them if they were late at Olean, and further said, "I will fix you all right." The conductor punched his ticket and returned it to him. Reaching Olean the plaintiff got off the train, made his journey to Portville, returned to Olean and took passage on the next west-bound train over the defendant's road, to complete his journey to Chicago. When the conductor came for his ticket the plaintiff handed the ticket, attached/ to which was the punched coupon from Binghamton to Salamanca. The conductor looked at it a minute and threw it back to him, remarking that it was "No good," and that he would have to pay his fare from Olean to Salamanca. After some wrangling over the matter, the plaintiff still refusing to pay the extra fare demanded unless the conductor would give him a written receipt therefor, and the conductor refusing to give such receipt, the latter stopped the train at a small station called Allegheny station, about the middle of the night, and, with the assistance of the brakeman and other employés of the road on the train, forcibly ejected the plaintiff from the train, using much more violence and force than was necessary and proper for such purpose, so that the plaintiff was severely injured in his left arm and wrist, from which injury he has suffered great pain and anguish, and for which he has received medical treatment. Upon reaching the platform the plaintiff, seeing that the night was very dark and the weather very cold, offered to pay the extra fare on to Salamanca if the conductor would allow him to reënter the train; but this the conductor refused to let him do, and in doing so used offensive and unseemly language. Part of the plaintiff's

baggage, containing some clothes, was left on the train and was never returned to him.

He spent the night at Allegheny station, and on the following morning hired a carriage and drove back to Olean where he again took a west-bound train on the defendant's road, and presented to the conductor the same ticket and coupon that had been refused the night before by the other conductor, and it was received without any question whatever as to its validity, and he continued on his journey. On cross-examination the plaintiff testified that he did not ask the conductor before reaching Olean for a stop-over check, and that nothing was said about such thing by the conductor; and on being recalled by his own counsel he stated that the agent in Boston said nothing about a stop-over check.

The plaintiff also introduced evidence tending to prove that it was the duty of the conductor, under a custom in relation to railroad matters, to give the plaintiff a stop-over check at Olean, without plaintiff asking for it, after the latter had stated that he desired to stop over at that place; and that the only difference between the form of a limited ticket, which was good only for a continuous passage, and an unlimited one, such as he had bought, giving stop-over privileges, was, that in the limited ticket the agent selling it would punch out the year, month and day it was sold, in the margin of the ticket, and punch each of the coupons with an L, whereas the unlimited ticket would not be punched at all by the agent selling it.

The evidence introduced by the defendant tended to contradict some statements made by the plaintiff with respect to the conversation had with the agent who sold him the ticket, and also as to the occurrences and conversations which took place between him and the conductor, immediately prior to his being put off, and the amount of force used in putting him off; but the main facts in the case, as testified to by the plaintiff, were practically undisputed. The conductor who put him off was called and testified, among other things, that he thought the plaintiff had a limited ticket instead of one unlimited, and so reported to the company; but that that mistake on his part

really made no difference, as the rules of the road forbade his taking the punched coupon at Olean, and required him to do as he had done, although, upon cross-examination, he admitted that he knew the coupon had not been used to Salamanca, because the punch marks in it had been made by the conductor on the train next ahead of his.

The rules and regulations of the road in force when these occurrences took place were introduced in evidence by the defendant, and with respect to stop-over privileges were as testified to by the conductor. It appeared that these regulations were put up in the cars of the company in 1875, but were not supposed to be remaining there in the year 1882; and it was not shown that the plaintiff ever had any knowledge or notice of their existence. The statutes of the State of New York allowing railroad companies organized under the law of that State to make needful rules and regulations relative to the management of their passenger traffic, and also permitting them to put a passenger who refuses to pay his fare off their trains, using no more force than is necessary for such purpose, were also put in evidence.

The conductor of the train which finally carried the plaintiff to Salamanca was not called as a witness, nor was his absence accounted for; but there was evidence of a high official of the road, brought out on cross-examination, that there were other ways of providing for a passenger entitled to a stop-over privilege than by giving him a stop-over check.

All the plaintiff's testimony with respect to the damages he had sustained, and also with respect to his conversation with the agent who sold him his ticket, was admitted, over the objections of the defendant, and exceptions were duly noted thereto.

At the close of the testimony the defendant presented eleven separate prayers for instructions to the jury, but the court declined to give them except so far as they were embodied in the general charge, and the defendant excepted. The plaintiff's counsel then stated that he should not claim to the jury that more force was used in expelling the plaintiff from the train than was necessary to overcome his resistance; and that element was, therefore, eliminated from the case.

There was no question in the case respecting the measure of damages, as the instructions of the court upon that question were not excepted to.

*Mr. Calvin P. Sampson* and *Mr. Seth J. Thomas* for plaintiff in error.

Whether there is such proof of agency as to warrant admission of the acts and declarations of the agent in evidence is a preliminary question for the court. *United States* v. *Clicquot's Champagne,* 3 Wall. 114. In the case at bar the ruling of the presiding judge, in this respect, was erroneous. Neither an agency nor the authority of an agent can be proved by the testimony of a witness to conversations with the supposed agent out of court. So far as respects the authority of the Fitchburg road to bind this company it does not appear that this company had given it any authority, except to sell tickets over its road with limitations and conditions printed on their face. It is quite different from the case of a sale of tickets by its own agent over its own road. *Lake Shore & Michigan Southern Railway* v. *Pierce,* 47 Michigan, 277; *McClure* v. *Phil. Wilm. & Balt. Railroad,* 34 Maryland, 532; *Burroughs* v. *Norwich & Worcester Railroad,* 100 Mass. 26.

In *Wait* v. *Albany & Susquehanna Railroad,* 5 Lansing, 475, the court stated their opinion that the power in a railroad corporation to make a contract to carry beyond its line is coincident with the power to make contracts for transportation with other carriers, and is confined to the governing officers of the corporation, and that its subordinate agents do not possess that power unless it has been expressly conferred upon them, or has been so exercised as to have become the established course of business. See also *Grover & Baker Co.* v. *Mo. Pac. Railroad,* 70 Missouri, 672; *Phillips* v. *North Carolina Railroad,* 78 North Carolina, 294; *People* v. *Chicago & Alton Railroad,* 55 Illinois, 95.

We submit that substantially this case has been twice decided by this court; first in *Mosher* v. *St. Louis, Iron Mountain &c. Railway Co.,* 127 U. S. 390, and more recently in *Boylan* v. *Hot Springs Railroad,* 132 U. S. 146.

As to the duty of the presiding judge to give the instructions asked, on the subject of damages, although he had already instructed on that subject, not inconsistently with them, we cite: *Mosher* v. *St. Louis, Iron Mountain & Southern Railway Co.*, 127 U. S. 390; *Boylan* v. *Hot Springs Railroad*, 132 U. S. 146; *Townsend* v. *New York Central Railroad*, 56 N. Y. 295; *Shelton* v. *Lake Shore & Michigan Southern Railway*, 29 Ohio St. 214; *Bradshaw* v. *South Boston Railroad*, 135 Mass. 407; *Frederick* v. *Marquette &c. Railroad*, 37 Michigan, 342; *Petrie* v. *Pennsylvania Railroad*, 13 Vroom (42 N. J. L.) 449; *Pennington* v. *Philadelphia, Wilmington & Baltimore Railroad*, 62 Maryland, 95; *Rawitzky* v. *Louisville & Nashville Railroad*, 40 La. Ann. 47; *Louisville & Nashville Railroad* v. *Fleming*, 14 Lea, 128; *Churchill* v. *Chicago & Alton Railroad*, 67 Illinois, 390; *Chicago, Burlington & Quincy Railroad* v. *Griffin*, 68 Illinois, 499; *Baker* v. *Coflin*, 31 Barb. 556.

*Mr. Clifford Brigham* (with whom was *Mr. Lewis S. Dabney* on the brief) for defendant in error.

Mr. JUSTICE LAMAR, after stating the case, delivered the opinion of the court.

There were eleven assignments of error originally, based upon certain exceptions to the rulings of the court during the progress of the trial, but in the brief of counsel for plaintiff in error they have been reduced to eight. As the only one of these exceptions that was properly saved, under our rules, was that relating to the admission of evidence as to what the ticket agent at Boston said to the plaintiff when he purchased his ticket, we would, perhaps, be justified in limiting our consideration to that point. Aside from this informality or defect in the exceptions saved, however, and as the assignments of error all refer either directly or remotely to that point, and thus relate to but one subject, we shall consider them, not separately, but shall, for convenience, treat them together. It is urged that the court erred (1) in allowing the plaintiff to testify as to what was said by the agent in Boston when he bought his ticket; (2) in its instructions to the jury upon this point, and

with respect to the rules and regulations of the road relative to stop-over checks; (3) in not giving certain instructions asked for by the defendant, upon the question of stop-over checks; and (4) in not telling the jury, in effect, that it was their duty under all the evidence in the case, to bring in a verdict for the defendant.

The grounds upon which it is insisted that the evidence referred to was inadmissible are, that the ticket itself and the rules and regulations of the road, with respect to stop-over checks, constitute the contract between the passenger and the road and the only evidence of such contract, and that no representations made by a ticket seller could be received to vary or change the terms of such contract. This contention cannot be sustained, and is opposed to the authorities upon the subject. While it may be admitted, as a general rule, that the contract between the passenger and the railroad company is made up of the ticket which he purchases, and the rules and regulations of the road, yet it does not follow that parol evidence of what was said between the passenger and the ticket seller from whom he purchased his ticket, at the time of such purchase, is inadmissible, as going to make up the contract of carriage and forming a part of it. In the first place, passengers on railroad trains are not presumed to know the rules and regulations which are made for the guidance of the conductors and other employés of railroad companies, as to the internal affairs of the company, nor are they required to know them. *Hufford* v. *Grand Rapids Railroad,* 64 Michigan, 631. In this case there is no evidence, as already stated, that notice or knowledge of the existence of the rules of the defendant company, or what they were, with respect to stop-over privileges, was brought home to the plaintiff at the time he purchased his ticket or at any time thereafter. There was nothing on the face of the ticket to show that a stop-over check was required of the passenger as a condition precedent to his resuming his journey from Olean to Salamanca, after stopping off at the former place. It is shown by the evidence, that Olean was a station at which stop-over privileges were allowed. Under such circumstances, it was entirely proper for the passenger to make

inquiries of the ticket agent and to rely upon what the latter told him with respect to his stopping over at Olean. *Hufford* v. *Grand Rapids Railroad, supra* ; *Palmer* v. *Railroad,* 3 So. Car. 580 ; *Burnham* v. *Grand Trunk Railway Co.,* 63 Maine, 298 ; *Murdock* v. *Boston & Albany Railroad,* 137 Mass. 293 ; *Arnold* v. *Pennsylvania Railroad,* 115 Penn. St. 135.

Upon this question, and also with respect to the action of the first conductor and the regulations of the road relative to stop-over privileges, the court gave to the jury the following instructions: "That if the plaintiff's testimony was true in regard to what took place between himself and the ticket agent in Boston, and afterwards with the first conductor on the defendant's train, and if the plaintiff, when he bought his ticket in Boston, informed the ticket agent of his wish to stop off at the Olean station, and was then told by the ticket agent that he would have to speak to the conductor about that, and between Binghamton and Olean the plaintiff informed the conductor that he wished to stop over at Olean and the conductor, instead of giving the plaintiff a stop-over ticket, punched the plaintiff's ticket and told him that was sufficient to give him the right to stop over at Olean and afterwards to use the punched ticket between Olean and Salamanca, then, whatever the rules and regulations of the road were, the plaintiff was rightfully a passenger on the train at the time of his expulsion, and the conductor had no right to put him off for not paying his fare, and the company was liable for the act of the conductor; that if, on the other hand, the plaintiff did not notify the conductor of his wish to stop over at Olean and received no such assurance from the conductor or from the ticket agent as he has testified, then the punched ticket gave him no right to ride as a passenger on the train between Olean and Salamanca without paying his fare, and if he refused to pay his fare when demanded the conductor was justified in putting him off, and his offer to pay his fare after the train was stopped was too late, and did not give him the right to ride on the train, and the conductor was justified in expelling him, notwithstanding the offer."

We think these instructions perfectly correct and that, upon

these points, they embodied substantially the whole law of the case. The gravamen of this action is the wrongful conduct of the conductor who ejected the plaintiff from the train. Whether the plaintiff told nothing but the truth with reference to what occurred on the train between him and the conductor before he was put off and at the time he was put off, or whether the jury believed all he testified to with reference to those matters, is not the question to be determined. But, taking the case in this particular most strongly in favor of the defendant, under the evidence submitted, it must be admitted that the action of the conductor was inexcusable. He testified, among other things, (1) that he thought the plaintiff's ticket was a limited one, and so reported it to his company, when, in truth and in fact, it was unlimited; thus showing carelessness and negligence in a most pronounced degree. (2) That he knew, or had good reason for knowing, that the Binghamton-Salamanca coupon had not been used to the latter place, because it had been punched by Conductor Hurty, who had charge of the next preceding train to the one of which he had charge; so that it was impossible for him to believe that the plaintiff was trying to ride on a ticket that had once been used over that part of the road. But he tries to justify his conduct, in this particular, by saying that he would not have been authorized to carry the plaintiff on his train, anyway, without his having a stop-over check procured from the conductor of the train on which he had ridden to Olean. It may be true that the regulations of the road were substantially to that effect; and it may also be admitted that the road had the right to make such regulations, subject, of course, to the reasonable interests, convenience and comfort of the travelling public. But the testimony of a very high official of the road was, that stop-over checks were not absolutely necessary, and that other arrangements might be, and sometimes were, made. And the very fact that the plaintiff afterwards, on the next morning, did travel from Olean to Salamanca on one of the defendant's trains without producing any stop-over check or any other ticket save and except the one which had been refused the night before, demonstrates clearly that the regulations of the

road with respect to stop-over checks were not unbending and inviolable.

Another circumstance, in this connection, is worth noting: The conductor of the train on which the plaintiff rode from Olean to Salamanca was not called as a witness, nor was his absence accounted for. It was not shown that he was not still in the employ of the defendant. If accessible, his testimony would have gone far towards showing the practice of the defendant with respect to stop-over checks; and his not being called by the defendant makes against its theory that the plaintiff had no right to be carried on the train from which he was ejected without having a stop-over check.

Furthermore, if the evidence of the plaintiff was to be believed, (and in this respect the charge of the court below was sufficiently guarded,) he did all that he was required to do before reaching Olean, to entitle him to the privilege of stopping over at that place and resuming his journey the next day. In fact, his course in this respect was in literal conformity with the regulation of the company, which reads thus: "Timely notice of desire to stop over must be given by the passenger to the company." The plaintiff testifies that he told the conductor that he desired to stop off at Olean and take a train south to Portville, and then, upon returning to Olean, resume his journey to the west on another train; and that the conductor told him he would fix him all right. Even under the regulations of the road with reference to stop-over checks, (although not brought to his knowledge,) he had the right to rely upon the statement of the conductor that he would "fix him all right," and had a right to suppose that nothing further was required to be done by him than was done to entitle him to a stop-over privilege. The conductor, after receiving "timely notice from the passenger of his desire to stop over" at Olean and afterwards take another train for the remainder of his journey, (as he had the right to do on an unlimited ticket,) was thereupon bound to furnish the passenger with a stop-over check without the passenger asking him, in so many words, for one. Under the circumstances of the case, as testified to by the plaintiff, the conductor of the first train was derelict in his duty in not

providing the passenger with a stop-over check when the latter stated to him that he desired to stop off at Olean, (as he had the right to do,) if such check was necessary to enable the passenger to complete his journey to Salamanca... If the jury believed the evidence of the plaintiff in this matter, they were justified in finding negligence on the part of the first conductor. And, upon the case as made by the defendant itself, with reference to what took place between the plaintiff and the conductor who ejected him from the train, leaving out of sight the disputed facts in that matter, it is very clear to our minds that the action of that conductor was unwarranted under the law; and that the charge of the court thereon was as favorable to the defendant as it had the right to demand. The authorities above cited abundantly sustain this view. The reason of such rule is to be found in the principle that where a party does all that he is required to do, under the terms of a contract into which he has entered, and is only prevented from reaping the benefit of such contract by the fault or wrongful act of the other party to it, the law gives him a remedy against the other party for such breach of contract.

These observations dispose of the questions raised touching the conversation between the plaintiff and the ticket agent, the rules and regulations of the company in the matter of stop-over checks, the acts of the several conductors in charge of the trains upon which the plaintiff travelled between Binghamton and Salamanca, and the conduct of the plaintiff himself in those transactions. If he was rightfully on the train as a passenger, he had the right to refuse to be ejected from it, and to make a sufficient resistance to being put off to denote that he was being removed by compulsion and against his will; and the fact that, under such circumstances, he was put off the train, was of itself a good cause of action against the company, irrespective of any physical injury he may have received at that time, or which was caused thereby. *English* v. *Delaware & Hudson Canal Co.*, 66 N. Y., 454; *Brown* v. *Memphis & Charleston R. R. Co.*, 7 Fed. Rep. 51; *Philadelphia, Wilmington & Balt. Railroad* v. *Rice*, 64 Maryland, 63.

It follows from what we have said that there was no error in the action of the court in refusing to direct the jury, in effect, to return a verdict in favor of the defendant. Neither was there any error prejudicial to the defendant in any part of the charge, above quoted, which the court gave to the jury upon the questions we have been considering.

With respect to the instructions requested by the defendant upon these points, which the court declined to give, except as embodied in the general charge, very little need be said. They are as follows:

(1) " The regulation of the defendant corporation, that the several conductors of its trains shall require of each passenger a valid ticket or pay the established fare, is a necessary and proper regulation, and if the plaintiff in this case having, as he says, taken defendant's train at Olean for Salamanca, did not, when thereto requested, present to the conductor a valid ticket but only a ticket that had been cancelled, and refused to pay his fare, then the conductor had the lawful right to stop the train at an intermediate station or near to a dwelling house, and put the plaintiff off the train, using only such force as was necessary for that purpose.

(2) " The regulation of the defendant that a passenger who desires to stop over at an intermediate station, and resume his passage by a later train, must, before leaving the first train, require of the conductor a stop-over check, is a reasonable regulation; and since in this case it appears by the plaintiff's own testimony that his ticket from Binghamton to Salamanca was cancelled before he left the train, and he did stop over at Olean, an intermediate place, and resumed his passage the next day and presented no stop-over check, but only the cancelled ticket, and refused to pay his fare when requested, and persisted in that refusal, the conductor had the lawful right to stop the train at the intermediate station, as he did, and put the plaintiff off the train."

What we have said above virtually disposes of these requests. In so far as they are correct, the substance of them had been given by the court in its general charge, and there was no error, therefore, in refusing to give them in the language

requested. *Washington & Georgetown Railroad* v. *McDade*, 135 U. S. 554; *Ætna Life Ins. Co.* v. *Ward*, 140 U. S. 76. In fact, it is much the better practice to refuse to give instructions to the jury, the substance of which has already been stated in the general charge, than to repeat the same charge in different language, although the charge requested may be technically correct as an abstract proposition of law; for a multitude of instructions, all stated in different language and meaning the same thing, tends rather to confuse than to enlighten the minds of the jury.

Whether the verdict was excessive, is not our province to determine on this writ of error. The correction of that error, if there were any, lay with the court below upon a motion for a new trial, the granting or refusal of which is not assignable for error here. As stated by us in *Ætna Life Ins. Co.* v. *Ward:* "It may be that if we were to usurp the functions of the jury and determine the weight to be given to the evidence, we might arrive at a different conclusion. But that is not our province on a writ of error. In such a case we are confined to the consideration of exceptions, taken at the trial, to the admission or rejection of evidence and to the charge of the court and its refusals to charge. We have no concern with questions of fact, or the weight to be given to the evidence which was properly admitted." 140 U. S. 91, citing numerous cases.

It would subserve no useful purpose to go more into detail as to the assignments of error presented. What we have already said virtually disposes of all of them. We think the evidence objected to was properly admitted; that the charge of the court as given was correct, and embodied the entire law of the case; that its refusal to give the instructions requested, under the circumstances, was not error; and that in no other respect, so far as this record discloses, was any error committed to the injury of the railroad company.

*Judgment affirmed.*